Thank you. May it please the Court, Carol Sobel on behalf of the appellants. This case arises from a challenge to a municipal ordinance in the City of Los Angeles that makes it a crime to live out of a vehicle either overnight, day-to-day, or otherwise. In this instance, the District Court granted summary judgment against the appellants on all counts and refused to consider the vagueness argument and dismissed all claims of Plaintiffs Taylor and Cable. Mr. Taylor, as we've indicated in our briefs, was properly included in the amended complaint. The only distinction, I think, in this instance was that he was not in the heading of the Fourth Amendment claim, but he was in the body of the Fourth Amendment claim by name. Mr. Cable is just an enigma to me. He was in the original complaint as a disabled driver, and then after the time the original complaint was filed, he was arrested for violating 8502. It's the appellant's position that the Court erred in dismissing all of those claims. Our complaint was controlled by notice pleading standards, and notice pleading standards didn't require us to use the magic words, vagueness. What about Iqbal and Twombly? What about the more recent case law? Your brief talks about notice pleading, but what about our more recent authority? I don't think that Iqbal and Twombly would apply in this instance, Your Honor, because they apply as a motion to dismiss standard, and there was never a motion to dismiss in this instance. So this was on summary judgment where the facts were fully developed. There was full discovery, and what this Court said in Alvarez v. Hill and in other cases and what the Supreme Court has said is you give notice pleading, you give sufficient facts, and we gave a lot of facts. Well, in the complaint, where does it put the reader on notice that there's a void for vagueness argument? It says that, well, it says two things. It says that 8502 violates due process and the right to travel. Due process avoids for vagueness. It says due process. Does it ever say void? Does it ever say vague? No, it does not. But the notion of notice pleading is that you develop your arguments then. You're not required to state what your legal theory is under notice pleading. So you develop your arguments through discovery, and what this Court has held is that discovery puts the other side on notice of what your claims are. Is the best notice in the complaint the reference to due process? It probably is, Your Honor, yes. All right. But we also included the ordinance, and we argued in the fact that the ordinance violated the rights of the plaintiffs because there was no way they could conform their behavior to 8502. You never formally moved to amend the complaint, and it was too late by the time this arose? Is that what happened? I mean, wasn't there an easy solution to this was to simply say, okay, we'll amend the complaint? The Court rejected our request to amend the complaint. At that point because it was too late to amend the complaint? Well, it isn't too late to amend the complaint because, you know, under one of the... So one way to look at this is whether it was an abuse of discretion not to allow you to amend the complaint. Yes, that's correct, Your Honor. Because you did ask to. Yes, we did in our opposition to the motion. And the facts have been developed, and this issue has been... In the depositions, there was a lot of discussion about how they were supposed to know, and so on. And as we pointed out, Your Honor, particularly for the Boyd for Vagueness argument, the discovery in this case was very much delayed. So on August... I believe it's August 10th, we finally got documents from the city in their 10th supplemental response that set out what supposedly were the policies about the enforcement of this ordinance. That was long past the time to amend the complaint. But the rules of civil procedure in the cases decided by this Court allow you to amend the complaint to conform to the evidence even on summary judgment. The Court would not let us do that. Pardon? Or even after trial sometimes. Or after trial sometimes. Or on appeal. After, you know, an appeal. But the Court below would not let us do that. The April date was a hard and fast date for the Court. We had almost no discovery by the April date.  You know, we got the discovery... The August 10th was the end of the discovery period when we finally got the city's policies from 2008 and 2010 and all their other directives to the officers. Perhaps you should go on to Maris meanwhile. Okay. So I would like to address the Vagueness issue because I believe that it was improperly dismissed and that it really controls the outcome of this case. This is an ordinance that provides no standards, no guidance to the officers. It has... It provides unlimited discretion in a criminal statute that has no mens rea. The basic principle of Vagueness doctrine is that laws have to give notice to people of ordinary intelligence of what they do... what they have to do to conform to that law. In this instance, 8502 gave no notice of how you could conform to it. But even with that, the actions of... Insofar as it's said overnight, that wasn't so... I would assume that the overnight part of it is not vague. And so one of the problems is, you know, there's all this language in the cases about it has to be vague in every application. I assume we just... No one was claiming that these people were being cited under the overnight part of it. So we just sort of back that out? Is that what we do? Well, I don't know if you back it out, Your Honor. I think that the reason the overnight part is important... Well, it's important in showing what the other two aren't. What the other two aren't and how the plaintiffs understood this ordinance. They... When they were advised of the ordinance, when they learned of it, when Mr. Jacobs Epstein, went to look it up after he was advised that there was an ordinance but not told what it was, he read it. He understood it to mean I couldn't sleep in my car overnight on public property or public street. So he searched for a place where he could stay overnight safely and without violating the law. But what that means is that he understood that much of it. So that much of it is not vague. And therefore, if we're going to analyze it under the vagueness doctrine, we essentially have to say that... We have to regard it as a divisible statute and say, well, the overnight part of it is not vague, but that's not what we're worried about here. What we're worried about here is the day-by-day or otherwise. That's correct, Your Honor. That's correct, Your Honor. And to underscore that point, when Captain Peters explained at his deposition about how he had helped two women in the community who were homeless and living in their vehicles and found them shelter for the night, the next question to him was when they came back to their car the next day, did you consider them to be violating the ordinance? And he said no. Someone who stayed in the shelter at night would not be violating the ordinance. Mr. Taylor, in this instance, read that ordinance, got rid of almost all of his personal property, put it in a storage place. And, in fact, he was parked at the storage place on the morning that he was arrested for sitting in his car when it was raining. But he got rid of all his property, started staying at the shelter, the shelter in Culver City, took the bus there because you can only get there by bus. You can't take your vehicle to the shelter you're not allowed to. You have to come on a pre-approved bus. So he would take the bus to the shelter and be returned at 5 o'clock in the morning. And at 5 o'clock in the morning, ordinarily, he never went back to his car because he knew the officers were there and were watching him, and they testified to the same thing. They never once found him in his car in two months of watching him except for the rainy morning when he was sitting in his car. So the plaintiffs understood this ordinance to mean, you know, you shouldn't be in your car overnight. Beyond that, there is no standard as to what amount of property or what items of property will put you in violation. Or how long day by day is or what otherwise. Exactly, exactly. There's no other guidance. All Mr. Taylor had in his car was the sleeping bag he kept with him in case he missed the bus and then had to sleep on the sidewalk pursuant to the settlement in Jones versus City of Los Angeles. He wasn't going to sleep in his car. So that's all he had. And as the photographs in the exhibit show, he had the food he was eating then, and according to the officers, he had five books. You know, not a whole lot. Quite frankly, I have a lot more property in my car. But because this is a criminal ordinance and it's vague, it behooves the city to create guidelines for the officers. In 2008, the city did create a set of guidelines. And in those guidelines, they said you have to see somebody in their car overnight or you have to see them late at night and early in the morning so that you can draw the inference that they spent the night in their car. All of that was removed in 2010. After the town hall on homelessness, when the city decided that it was going to enforce the laws very, very literally against homeless individuals or people believed to be living in their vehicles, they issued a different order to the officers that stripped out all of those limitations on three days or overnight and seeing them there in the morning at night and instead substituted Captain Peter's four C's, which were these vague directives, the commander's intent, constitutional policing, community concerns, and I think the last one is compassion. And that was it. That was all the officers were guided by at this time. I have a question, Counsel. Forgive me for interrupting, but right at that point, there's a place in the record where Captain Peter said that he rejected the guidelines because he believed in giving officers more discretion. Correct. Did he reject the old guidelines in favor of these four C's? Correct. Okay. I'm not sure I understood that. Where are those four C's documented? It's at the Excerpt of Records 392. It is the 2010 operational plan. And so that's what was in use at the time of these events? At the time of these events. Okay. And, in fact, what Captain Peter did was exactly the opposite of what he should have done. He wanted the officers to have unbridled discretion. That violated the law. Did he say that? Unbridled? No, he did not say unbridled. He wanted more discretion, right? He wanted greater discretion, yes. I think it's important to be accurate, so just to be clear. I apologize. That's all right. But I just want to make sure I'm understanding the facts. And what he was referring to is that he wanted them to follow the four C documents. Correct. Thank you. And so the net result of that is that, well, Captain? What prompted all of this in Venice? Venice is part of the city of Los Angeles. And so why was the focus on Venice? Well, the focus was on Venice because there were complaints about people living in large RV vehicles on the street. And according to Captain Peters, there was a spike in crime. But the crime was related to, I know Your Honor is familiar with Venice, but the crime, according to Captain Peters, was related to what he called young transients, people who lived on the boardwalk and around there  And they were, in the minds of the police, they were engaged in burglaries from autos, other things like that. And so this came to be as part of a general crime response, which under Chicago, city of Chicago versus Morales, is not a justification for enacting a vague criminal law. It was not sufficient in Chicago, despite the incidence of crime there, and it was not sufficient here. But that is what brought it about. You know, I mean, Venice is an area undergoing gentrification. There is, as there is throughout all of Los Angeles, a tension between new residents to the area and old residents to the area. The law only, or the way it was interpreted, told these folks that they couldn't sleep in their cars. If they wanted to sleep on the sidewalk, they could sleep on the sidewalk. Well, they're allowed to sleep on the sidewalk pursuant to the settlements in Jones versus city of Los Angeles. That's absolutely correct. They could have all their property on the sidewalk, which from an aesthetic point of view, I think, would be a greater issue than having it inside a car where people don't see it. But the city was going to provide a parking facility for these folks. Did that ever happen? No, that did not happen. The city of Los Angeles provided no parking because no community wanted parking in their area. I know from my involvement in this that it ultimately came down to two sites, one of which was the Purdue Courthouse, and the other of which was Councilman Rosendahl's office in Westchester. And neither one of those developed either. The Purdue Courthouse is quite a distance from Venice. It is, Your Honor, but if you could drive your vehicle over there and lawfully park on that parking lot, without the permission of the city, if you drove your vehicle over there and parked on the street, even if you put money in the meter, you're violating the law. And that's the other problem with this. Patricia Warabanshik was driving through the city at 7 o'clock in the morning from Santa Monica, where she stayed and where she had stayed for five years. And she was pulled over, ostensibly because her blinker was on too long. She was the artist. Yes, she was ceramicist, yes, Your Honor. Ceramicist. And the only result of that detention was a warning about 8502, about living in a vehicle. You know, it is, the problem for her too is that she was leaving that detention with the officers and going down to Westchester, which is the area around the airport. And she was going to a school there to participate in a craft fair. When she got to that area and she parked her car, she and she alone, of all the artists participating in that craft fair, was necessarily violating 8502. Because she did live in her vehicle, but lawfully so, in the city of Santa Monica, which has no similar law. But when she got to Westchester and parked at a public school, she was on public property and she was violating the law. So there is no, I return to the notion that there is no limit on this. Almost every other ordinance, with one exception, that has upheld a similar law, has had a restriction to nighttime sleeping. So in Joel v. City of Orlando, it's nighttime sleeping. In Whiting v. Westerly, it's nighttime sleeping. In Toby v. City of Santa Ana, the case that the city relies on so heavily to justify its position, it is nighttime sleeping in the park. It is not a daytime preclusion. And in fact, the court, Calvary's Green Court, was careful to emphasize that you could be in the park with all your possessions during the day. You could even sleep in the park during the day. You just could not sleep in the park at night. Just to clarify what you said before, the 2008 document is not a current document, is that what you're saying? No, it is not. Superseded by the September 2010 document? Yes. And Captain Peters testified to that in his deposition, that he rejected the 2008 document because it was too limiting on the officers. Now, I gather that this argument, the vagueness argument, does not depend in any way, or at least not in any substantial way, on a right to travel. That's exactly right, Your Honor. The fact that there's some liberty interest has some relevance, it would seem to me. But not as a formal right to travel. I think that's correct, Your Honor. The right to travel argument essentially said that is it no one who has property in their car that Let's say that I found it misdefined. Because the whole point was they were traveling. If they were traveling, they were trying to go anywhere. Well, Warren Bunchuk was traveling. Yes, but nobody else was traveling. Right. But the officer said that the sole reason they did not cite her for violating 8502 was because she was not parked when they pulled her over. So she was traveling. You're essentially abandoning the right to travel argument. Is that fair? In terms of our obsessiveness, if it's still there, we're going to have to address it. Is there any reason we have to address it? No, I believe that the vagueness argument is positive. If the court believes that this is a vague ordinance and the court below improperly ignored the argument, then that is dispositive. Let me just turn briefly, if I may, to the disabled plaintiffs who were all cited for My question about that is it appears to me that was a mistake. They seem to understand now it was a mistake. Why do we need to worry about it? Is it still happening? Is there any evidence that it's still happening or will happen again? It is – well, let me say two things, Your Honor. I don't believe it was a mistake. I believe it was an intentional part of this whole plan to go after people. Yes, but they didn't realize that there was an exemption. Now they know there's an exemption. There's nothing in the record to suggest they're still doing it. What do you want out of it? You know, Your Honor, if the court were to note that this was apparently a mistake and they now recognize the exemption, I think that would be fine and it would certainly create some form of a judicial estoppel. But we continue, just so the court understands, we continue in the City of Los Angeles and in the Venice area to litigate issues of overnight parking districts and vehicle restrictions, which are still aimed at the same people. At the moment, you know, they have particular problems. The fact that they were applying durational parking requirements that by state law don't apply to these people, they just – yes, they prefer to be able to apply it to them once they discover they can't. They stopped, is my understanding. Well, it was more than durational. Just so the court, you know, the record is clear, it was more than durational parking requirements. It was also oversized vehicle and the consideration was also given to preferential parking. All of those restrictions are constrained by the protections for disabled drivers. The only thing you can get out of it would be an injunction and there doesn't seem to be any basis for an injunction because it doesn't appear that it's happening. Your Honor, I understand the court's position and I will not argue that argument further. And if a party had – a person had a handicapped placard or handicapped license plates or disabled veteran's license plates, how would this affect them? Well, it did affect them because all of the people who were cited had disabled plates except for Mr. Cagle, who had a placard. So it would – if they were to park there and if the city were to, again, begin to enforce – But doesn't the vehicle code allow them to park there? Oh, yes – Without putting money in meters? Yes, that's – Without restrictions? That is our argument, Your Honor, is that the vehicle code protects them. They are taken out from under all parking restrictions except if there is a parking sign that says, no one may park here from 4 to 6 p.m. Then a disabled driver, like any other driver, may not park there. But since your time is ticking away, is it right that you were only looking for injunctive relief and you're no longer concerned that this is going to be a problem? Yes, Your Honor. But you want – you're hoping, it sounds like, that they'll note this in our order? Yes. So, yes. Yeah, what was that again? I understand. What was that again? That I was only looking for injunctive relief on those claims and that I'm – I think I've presented them adequately at this point. Oh, okay. Okay? I would like to reserve any additional time that I have left for my rebuttal. We'll give you some time just so you don't spend the night here. I took everything out of my car, unfortunately. Good morning, Your Honors. Bly Bock on behalf of the city of Los Angeles. Tell me, why is this directed towards them? Because – well, as set forth in some of the LAPD memos, that there has been a series of citizen complaints and there was a lot of problems arising, not just out of people living in their car, but there was just a lot of issues relating to the Venice area, and this was one of the many components of that. And there were a lot of citizen complaints about people coming home and finding the refuse of the car habitators on their front lawn and pretty horrifying. That, of course, goes back to the Supreme Court's statement many years ago that if you want to ban littering, ban littering. So this is not a statute about littering. Right. It's a statute about car habitation. It's actually been on the books for about 29 years. But if the problem is littering on people's front lawns, then you make a law about littering on people's front lawns. There probably is one. But Justice Pragerson was asking me how this task force came about, and I'm just trying to point out that it essentially arose in response to the complaints that the city was receiving from the area. And the LAPD or the city's response to those complaints truly has this situation. What are the councilmen? What did he have to do with it? Phil Rosendahl? Yeah. He took some steps, I believe, my understanding is, to try to assist the homeless. He started a program, I believe it was, I forget the name of it, Streets to Home. He's a good guy. Right. And that really is the point, is that there's a lot of people in the city, they are good guys. They do acknowledge the issue here. I have to talk about the problem here. It is – I assume at some point you're going to discuss the procedural issue, but leaving that aside for the moment, what – how do you explain what this, in fact, means? Why was Mr. Taylor living in his car? Or living – why was he using it as living quarters if he wasn't sleeping there, he didn't have his possessions there? How – what made him be living in his car? You can – day by day or otherwise, whatever that means. Right. The situation that these appellants are in, it's horrifying. I acknowledge that. It's horrifying. No, but the question is what does the statute mean? What – of his conduct, what constituted dwelling in his car? What – then I – Having him as living quarters day by day or otherwise. Let's sleep at the overnight. We understand that he slept overnight. We all agree that that would be clear and that that's not fake. But none of these people were sleeping in their cars, as I understand it. Or at least nobody has proven that they were. So backing that out, what does it mean to use a place as your living quarters day by day or otherwise? Well, it means, in essence, what the plain language – what I would call the plain language of it means, which is using your car as a living space, using your car as a toilet. These plaintiffs, they do acknowledge that they were. There are pictures of the bottles of urine that they kept in their vehicle. Using your car as a kitchen. So they have bottled urine in their vehicle. So what's wrong with that? Well, it's unsanitary for one. Well, it's in their vehicle and, you know, they dispose of it. I gather Taylor didn't have any urine in his – He did, and actually I wanted to cite you to that part of the record. He had not just sleeping – Is that the criteria? Correct. So your interpretation is it's using it to go to the bathroom and nothing else matters? It's really – No, not – okay. It's like in the enforcement of any law. It's the totality of the circumstances. What law do you know of which is enforced by the totality of the circumstances, by the way? I understand that's the law about suppression for the Fourth Amendment, but what criminal law is enforced by an amorphous set of unknown circumstances? Well, we assume that it's not an amorphous set of unknown circumstances. Well, what are the circumstances, then? It's using your car as a place of habitation. And so Taylor – that's why I wanted to answer the question there. If you look at the supplemental excerpts at pages 333 and 335, you'll see that it was not just a sleeping bag that was in his car. It was a large amount of open food, some cut vegetables and fruit, and it was a bottle of urine. And also I believe that he was the one that had the car's steering column, which appeared to be inoperable, meaning his car couldn't even be driven. He said it was operable. No, but the police officer reasonably believed, upon looking at the steering column, that it was not an operable vehicle. But that's not a criterion. I'm sorry, that's not a what? It's not a criterion. If you want to make a statute saying you can't have an inoperable car on the street, I assume you could do that, but that's not a criterion here. Everybody else's car was operable. That's not what we mean by living quarters. Well, but it does play a role, and that's what I'm talking about as far as the totality of the circumstances, that when you have – the ordinance says you may not use your car as living quarters. Living quarters, the city submits, is a reasonably clear term, and that would encompass each of the activities that I'm talking about. Living quarters includes using your car as a kitchen, using your car as a living room, using your car as a toilet, using your car as a bedroom. And really the appellants have essentially admitted that they were doing that. Now, there's – Counsel, I come from Alaska, and we have hundreds, thousands of people who come to our state every year in Winnebago, and they live there, and they live in those homes on wheels, right? They have refrigerators and kitchens and toilets and showers, and some of them have hot tubs, and they're living there. So my question is, if a vehicle like that, if a person said, I live there, and that was parked outside city limits, but that person came into town, would that person be violating this ordinance? If the person had a vehicle, I believe that would allow the police to see it like as in these homes. The Winnebago, so it's got everything in it. It's got a full kitchen. It would probably be more difficult simply because the Winnebago by its very nature is much more of a contained – well, it's almost like a home on wheels. Are you saying it wouldn't violate the ordinance because the police wouldn't be able to see in the windows? No, I would say that's hypothetical. So my hypothetical is, let's say it's – the windows are open. There's no – nobody's making any bones about it. She lives in this vehicle in my hypothetical, but she drives it in, you know, sleeps somewhere else, and then drives across the limit, the city limit, and is in town and stops to buy something. Is that going to be violating this ordinance? I would say likely that it – I mean, I'd have to think about it, but I would say likely that it would, and that seems similar to Warren Bonechick's situation that apparently she was living in a city that did allow it. So there's no – there's no durational requirement here. You could be there for five minutes as long as it's a car – it's a vehicle that you use as a living quarter. Correct. Well, there are – there's the – So it's difficult to drive a camper in Venice. The day-by-day or overnight I think is that language. Or otherwise. Right, or otherwise. What's otherwise? The people that are not sleeping overnight. So the people that are – Is that my Winnebago hypothetical, somebody who just drives through, so you can't travel down the street into Winnebago? You can drive down the street. What if I park? The ordinance prohibits the parking of it. For any length of time. Correct. And this ordinance is selectively enforced in Venice because the people who live there just don't like the idea of someone who's homeless living out of their car. I wouldn't say that that's accurate in that the record doesn't support that. These plaintiffs do happen to live in Venice, but that doesn't mean that this is the only place that it's enforced, and there's been nothing to show that it was enforced. Well, I know of no other place where it's – tell me where else it's enforced. But I'm limited to the record. I'm saying in the record here. You can drive around this town now and probably find 50 RVs where people have been living in there permanently. I mean, I see them in Woodland Hills. Perhaps. I'm not aware of that. Definitely not in the record here. Suppose I'm driving through Venice, and I stop the car and I eat a sandwich and read a book. I'm waiting for somebody for an hour or two, and I park the car, and I'm eating a sandwich including some cut fresh vegetables and reading five books. Am I violating the ordinance? I would say no, and that's different, and that's where – What's different about it? Well, in that – I don't know about here. For one, you're not using – if it's you, Justice Berzon, you're not presumably using your car as a living quarters, and I think that that's evident. How do we know that? It's not durational. There are no – there's no – it's not – there's no set of criteria. The two activities I just described to you, you said it's more than one, and they're among the criteria that you say would count. So how am I supposed to know whether I'm using it as living quarters? Well, it's the – How can I do it every day? It's the nature of the enforcement of any criminal law and the doctrine of probable cause in that – First of all, this isn't probable cause. This is – because probable cause is one step forward, but the question is what is actually a violation. So let's get off the probable cause. It's not about probable cause. What is the violation? Well, it's relevant because you're asking me if you would be violating it. Again, I'm asking you not whether there would be probable cause to think I'm violating it. I'm asking whether I'd be violating it. I would say if your car looked like the plaintiff's cars or the appellant's cars that are in the record, that you would appear to be violating it. Suppose I was moving from somewhere to somewhere in Venice, so I had my car all piled up with everything I owned because I was moving it, moving my stuff, and I stopped the car and I ate my sandwich and read my book. Then what? That would be a defense that you would assert. But that doesn't – But how could it be a defense? There's no time limit. The fact that I wasn't planning to do it for a few days doesn't seem to be a defense. So what's the defense? Because you're not – Suppose my car looked exactly like one of these guys because I had everything I owned in it, but I was planning to move it into my house the next day. Then you're not using the car as living quarters. You're using the car as a moving van. How do we know that? Because that would be your defense that you would explain. The fact that they're – being innocent or guilty doesn't mean that the ordinance itself is suddenly vague. Counsel, did all these people live in Venice or just Patricia W. did not? Is that right? It appears that they live in Venice, yes. That's what it looks like. Oh, wait a minute. I thought I understood that the ceramicists did not. That's Patricia Warren Vonchick. Okay. Is it right that Ms. Warren Vonchick did not live in Venice? My understanding is that she doesn't, and Ms. Sobel just said she lives in Santa Monica. Right. But I thought you just said, yes, they all live in – did I get that wrong? I thought you were saying except the ceramicists. So the other ones, my understanding is that they do live in Venice. Forgive me. I think we're clear now. She does not. All right. Okay. Well, Santa Monica, well, I guess it's a separate entity now. Correct. It's a separate city. Just to be part of the city. So I'd like – I'm sorry. Go right ahead. Well, I would just like to read – Can I ask you a question? What does Long Beach do? I'm not aware of what Long Beach does. I don't know. Long Beach treats people differently. They find family and living in a car. The first thing they do is they take the kids and they bring them to a facility where they can be going to school so they don't fall behind. The next thing they do is look for housing for the families and try to find a job for them. That's what they do in Long Beach. Did you know that? No, I don't. And I think those sound like positive steps. But, you know, the heartbreak – Why does the city of Los Angeles do that? I don't know. And that's a question for the city council. That's a question for the legislature. The heartbreak of the appellant situation, it is heartbreaking. But it is a question for the legislature. The question here before the court is not what the city could do. That's a cop-out. You know, it's a question for the legislature. But it's the law. The question should not be what the city could do or should do. It's what the city is doing and whether or not what it is doing violates the Constitution. You have somebody come into the city in a covered wagon, and they park there, and they want to live in there, and they can't do that. Correct. The city – that's what the bottom line here is. That the city wants to have the chance and constitutionally should have the chance to regulate what happens on its public streets, whether or not people can live on their public streets. It's not that they can't travel in the city. They can travel as much as they want. They can even live in their car. They just can't do it on a public street. Okay, wait a minute. So go back to my Winnebago, okay? I live in it somewhere else, this hypothetical Winnebago, and then if I drive into the town and stop at a grocery store to get some food, I'm okay driving down the street, but it's not okay because I park? When you park in a city street, that's when 8502 comes in. The parking is different than driving down the street? Right, because when you drive – 8502 specifically says, shall not park. Well, do we have any reason to think that they're actually enforcing this law against people who are driving Winnebagos? Isn't this exactly the kind of a statute that leads to the selective enforcement problem that vagueness is supposed to deal with? That is, in fact, if Judge Christen's hypothetical occurred, it probably occurs often. Do you think they're stopping tourists in their Winnebagos or parking their Winnebagos by the beach and going out on the beach? Do you think those people are really getting cited? Well, I don't know, but if those people – if they're just on their Winnebago on vacation, they theoretically would not be using their car as living quarters. It's different than people that are – Why not? I mean, they're using their Winnebagos for their vacation, and they're coming to Venice for the day and parking their car and going off, parking their Winnebago because that's all they've got to drive in, and going and taking their kids to the beach. Now, they would – in your theory, they clearly are violating that statute if it's – or I don't know if it's clearly – nothing's clear about it. But if these guys were violating it, it appears they might have been – maybe they were violating it, but surely no one's trying to enforce it against them. But selective enforcement isn't, in my understanding, part of what they're – Well, I understand that, but that's because there were no criteria. Could it be enforced against them? Were they living there? Even though they're not – it doesn't seem by any ordinary language that they're living in Venice. They're parking their car – they're parking at an RV place at night, but they're coming into town in the daytime, but there's clearly a vehicle equipped for living. Correct. So theoretically, they wouldn't be able to park in a public street like that. I would assume. But again, you know, these are difficult – Do you think the word parked means the same as standing upon? Is that what you're saying? Because you think it's fine if I keep driving my Winnebago down the street. Is parked and standing upon redundant in the statute? No person – well, it actually – the word parked is actually in the ordinance. No person shall use a vehicle parked or standing upon. But I'm looking at parked or standing upon. Are you saying that standing upon is the same thing as parked? I mean, I assume that that would encompass just a car that's on the public street. Not moving. I would assume, yes, standing. That would be my reasonable interpretation. Okay. That was my second-to-last question. I appreciate it. I want to speak for my colleagues. I'm concerned about this statute being void – vague, forgive me. And I fully appreciate there's a procedural issue. But I'd like to hear your best shot at telling me why you think this is not vague. Well, my plan was I wanted to actually start off and read an ordinance that has been affirmed as a proper and precise ordinance, giving proper notice. In my opinion, it has essentially no analysis about that. It says it, but I don't know why they thought – I mean, they didn't say why they thought it was clear. They didn't deal with any of these problems. And it wasn't the same language either. Well, can I please read it? Sure, but it's not the same language. I think it's very similar. It shall be unlawful for any person to lodge in, on, or about any automobile, truck, trailer, camper, or similar vehicle in any public street, public park area, public way, right-of-way, parking lot, or other public property within the limits of Clearwater, Florida. And it's not at all clear that they understood that to apply if it wasn't being used overnight. They took out the sleeping thing because they said that sleeping could mean, you know, just napping. So they obviously – but they didn't say that they were understanding it to mean not using it overnight, and I bet they were. But the removal of the word sleeping, in my view, makes that even more analogous to 85-2, because now it's limited – it uses the word to lodge in. So the only difference is using a vehicle to lodge in or using a vehicle for living purposes. But was there any indication in that opinion that they understood it to be applying to people who did not stay in their cars overnight? Well, they don't talk about the sleeping. No, but I'm sure that that was their assumption. Because it would be anybody's assumption, and this statute eliminates that assumption because we know that overnight is one category, but it also covers day by day or otherwise. And it is at least an odd usage of the English language to talk about using something as living quarters if you're not staying in it overnight. That's a strange way to live someplace. That's why it's very hard to figure out what you're talking about. Well, that could be one of the factors. It's true, but, I mean, here, for example, the plaintiff – the appellants were – when they encountered the police, they were sleeping. And so, again, he was – That's not true. No, it is true. Would you like me to point you to the records? Jacob Zelfstein, Officer Gonzales, said that she encountered him when he was sleeping. That's at Supplemental Record, page 413. Yoshioko said it at Supplemental Record. Every time? Every time? No, no, just one time. I'm saying that these plaintiffs had been. At night? Cagle. So when he was – Cagle and Taylor, they were both – It was during the day, I believe. During the day. Correct. You can't just sit in your car and it goes off. Correct. And one was wrapped in a blanket with his front seat down. What's wrong with that? Sleeping. It's just like anything. There's nothing wrong with that in and of itself, but when you have the totality of somebody sleeping in their car – The trouble with your totality – I'd like you to tell me another – a criminal statute that is a valid one, which relies on an amorphous set of considerations that are – which cannot be defined or ascertained. Because that's what you're arguing. Well, that's not what I mean to be arguing. I think it's just – it's like the Broderick case. It's commonplace language. Not every word needs to be specifically defined. So, for example, disorderly conduct. You know, we could stand up here and come up with a lot of variations of what is or isn't disorderly conduct. Lewd and lascivious behavior. That's a hell of an unconstitutionally vague as I understand it. I'm not aware of it. I'm saying that there are penal statutes or, more germane here, ordinances. The English language is not always perfect. And we submit that a phrase like living quarters is relatively straightforward. And it's true. They have personally interpreted it as being hard if it included staying there overnight. I mean, that's what – for most people, if you ask them, what does it mean to use something as a living quarters, they say, well, you stay overnight. Now back that out. Once you back it out, it becomes really amorphous. Well, the cases that I cited that talked about the use of an – the interpretation of the word inhabited dwelling, for example, in the other criminal statutes for purposes of residential burglary, they did not find sleeping to be dispositive in the late. They found it didn't matter. They had, you know, I think one of them was an apartment where somebody had not quite moved in and had not slept there. So there were plenty of examples. And the courts there said specifically using it as a sleeping quarters is not dispositive of whether or not it's a residential dwelling for purposes of that penal statute. So the fact that the appellant had personally interpreted it to mean, oh, well, I'm not sleeping there, so I'm exempt, that's just their personal interpretation of it. That doesn't render the ordinance vague. What's your – the answer to my question, what's your best argument that this is not vague other than the other court deciding that a different ordinance was not vague? That it's commonplace and standard language that should be reasonably interpreted. And, in fact, the appellants here each acknowledge that they are, in essence, living in their car. The only thing they're not doing is sleeping in it. But I think that the cases I cited relating to the residence for the burglary statute shows sleeping is only just one of the many factors. I'm seeing my time is ticking. I want to just make a couple of points. One, as far as the agencies – I was sleeping on the sidewalk at night. That's okay. Apparently that was approved in a settlement agreement with the city, which I was not involved in. And so the city has agreed to that. That doesn't make it constitutionally required. It was something that we agreed to in the settlement agreement. I would like to just make – Why did you do that? Again, I wasn't involved in that lawsuit, so I can't tell you. In other words, if these folks have their car there and nighttime falls upon them, they can just take their sleeping bag, put it on the sidewalk, and sleep there. Maybe have an air mattress. Winnebago stopped at a stoplight. Standing still at a stoplight violates this ordinance. I would have to think about that, if that could fall under the standing. I can tell you that the officers, though, were pretty uniform in their interpretation, as far as they – and this happened in each of the instances with the plaintiffs, in that they were cited when they were parked, sitting in their car, full of all these belongings. Well, they were told that this was a special task force, and that whoever it was wanted this place cleaned up, and they want it cleaned up now. Isn't that what happened? That was apparently part of the task force's duty. And that's what they did. So the officers want to show their superiors or whoever it is that's running this special task force that they're really out there gung-ho, and they're going to get rid of as many of these homeless people out there as possible. And that's what they did. They come back day after day after day. You had a couple points you wanted to make. I'm sorry, what? You had a couple points you wanted to make. I just really want to squeeze in just a few points real quick. One, I want to just talk to you. You didn't squeeze in an answer to my question. I'm sorry, I didn't hear a question. I thought that you were commenting. I gave you a big question to answer. You didn't get it? I thought that you were making a comment. I very much apologize. What was your question? I thought you were making a commentary about it. I didn't realize you were asking me a question. Tell me if I'm wrong. I mean, you had a task force here. How many police officers? Was it 25? I don't know the exact number of them. You had a task force of police officers. They were told that their job was to clean up this menace area and to get rid of the people living in their cars because the people in the neighborhood just didn't like it. Is that right? Well, there was crime that was happening. There was vandalism. I don't know what were the crime statistics. I'm telling you that this is what the police officers have. I don't care what they said. You send a bunch of police out and you can find plenty of crime all around here. You get 25 police officers. Apparently, there had been a spike in crime in the area was one of the many factors leading to this. Well, Venice has always been a rough place. Can I just squeeze in my point? One, I want to talk about the LAPD's guidelines, which Appellant Counsel had talked about. I want to just really emphasize that the Hoy case talks about using the Hoy, which is cited in my brief. I'm sorry. The 2008 guidelines were operative. I'm not sure if they were operative. Honestly, I'm not sure I know that. What guidelines are you talking about? It's true that the internal memos from the LAPD, there's policy memos. I can give you the page. That was his sort of language in the deposition, Captain Patterson. Captain Peters. But I just really want to emphasize that in the Hoy case, they say you look to the agency's interpretation, which is these guidelines. I know, but I want to know what guidelines you're talking about. I thought the ultimate guideline is we want them to have a lot of discretion and we don't really have any guidelines. What guidelines are you talking about? I'm talking about the 2000, there's a memo. 2010. Correct. What does it say? Where's the guideline there? I mean, I can go get it from the record, but my point is I want to emphasize to you that we should only look at those guidelines, even just to begin with, whether they're effective or not or in place or not, if we find the ordinance itself to be vague. You only look at that to narrow the meaning and not to find more vagary. Okay. It's basically what the Hoy case says. So I think that here we need to really start off and just focus on the actual ordinance. The other point I wanted to address was the amendment of the complaint, and I'd like to emphasize that there's a court order, and this is in my supplemental record at page 22, that specifically talks about the last day to amend the complaint. Go back to Hoy for a moment. Okay. What Hoy said was it doesn't make the ordinance vague, but it may make the enforcement vague. In other words, it doesn't make the ordinance vague, but it, first of all, could inform that question. Hoy was not about vagueness. It wasn't a vagueness case, as I recall. But also, I would think the guidance could inform the question of whether it's vague. But aside from that, it could also itself be vague and demonstrate a vague policy, even if not a vague ordinance. In any event, it's not relevant. But Captain Powers, just like the law, giving the police officers discretion doesn't mean that it's unfettered discretion. It doesn't mean that suddenly, because the police officers have discretion to enforce it, it's a vague ordinance. I mean, that's what police officers need to do. Did you have another point? I'm sorry, what? You had another point, you said. I just wanted to make the point that as far as the amendment of the complaint, in my supplemental record at page 22, there was specifically a court order notifying everybody of the last day to amend the complaint. No amendment was filed. I assume that appellants are saying that they sought amendment by virtue of filing motion for summary judgment, which added all these claims. Their statement was that they asked for it in the opposition to the summary judgment. Okay. But be that as it may, when you get to the point where responsive pleading has been filed, i.e. an answer, it is up to the judge. It's an abuse of discretion standard whether or not an amendment is appropriate. Finally, I just want to point out the individual claims. There is really a tremendous amount of individual claims that I'm hoping the panel will recognize are absolutely without any evidence. There's a lot of the plaintiffs that were never even cited under 8502. As far as Civil Code 52.1, I think both sides agree that essentially the case law has shaken that down to essentially two categories. One is the SHOIA type of a case where you have the underlying constitutional violation, does not have a threat or coercion or intimidation inherent to it. Like in SHOIA, it was a prolonged detention, but it arose from just an administrative error. The other category is what appellants cite, the Holland case. In that case, you had a strip search. You had excessive force. You know, you had aggressive activity by the police officers. And that, they said, yeah, that's a threat, coercion, or intimidation. So in that kind of a case, you could have a Civil Code 52.1. I think here the record's pretty clear that no matter what you find the statute to be, there isn't that kind of conduct. It's much more of a SHOIA kind of a case. You have police officers being what the appellants themselves describe as polite and professional. Nobody was out of hand. Nobody was even rude. What about this question about the parking ordinance? I mean, are we on the same page about that? That is that it's recognized that that was a mistake and that it's not happening and so on. Yeah, we have, I mean, what we have is the plaintiff's got one or sometimes two parking citations. We have an officer who was new on the beat who didn't know about the law, recognizes error. So that's a yes? Yeah, that's a yes. Thank you. Thank you, Your Honor. Just a couple of quick points. Let me begin with the 52.1 argument just briefly. I will file a Rule 28J letter, but I only realized last night that there is a new decision from the California Court of Appeals, the 52nd Appellate District, explaining Shoyoya. It's Bender v. County of Los Angeles, 217-CALAC-4968. It came down this summer. And essentially the court distinguishes between a negligent tort, which was an issue in Shoyoya, where they forgot to release him, they just overlooked it, and the intimidation and threats and coercion inherent in an excessive force case or an arrest case. And Bender says you can have a 52.1 claim. What is the role of 52.1 here? It is a... Does it add anything to the 1980s? If the court decides on Baden-Skrams, no. It is a way around Monell. Because it, you know, so essentially I just wanted to address that because I don't want to... The other point that I would make is... What was that? Give me the... You know, if you have a new case where you're supposed to send it a 21-J letter, you have to give it and do that. And I will file that 21-J letter tonight so that the court... Everybody looks at the stuff the night before. That's why we have... You do that. Give me the site now. 217. 217. Cal App 4th 968. The case name is Bender v. County of Los Angeles. And it is from the 2nd Appellate District. So, you know, under California law, that impacts whatever precedence Sho-Yo-Ye would have in any event. The other reason to file the 28-J earlier is because it's not fair to opposing counsels when I have an opportunity to respond. I absolutely understand that and I apologize, Your Honor. So the point that I did want to make is to illustrate the issue of the durational requirement and how vague this law is. Officer Gonzales, who was the officer who arrested Mr. Jacobs-Elstein several times and threatened him, when she saw him outside the church where he volunteered for a homeless services program, a food sharing program, he was sitting on church property. His car was parked on the church property. It was nowhere to be seen. And yet Officer Gonzales told him that if she saw him again, he would be taken to jail. As to her deposition about whether it was her belief that Mr. Jacobs-Elstein was violating 8502, at the point she saw him on private property, with his vehicle on private property, she responded that he could be because she knew he was living in his vehicle. So the fact that he wasn't on the public street made no difference to her. She was also... Is the point that even the police officers don't know the limits of the ordinance? Absolutely. Or what point are you making here? Absolutely, Your Honor. Talk about that. As to that, the statute doesn't say it. It's just wrong. Okay. And so I was just going to give another example of Officer Gonzales and whether she would cite somebody who parked on the street outside one of the social service agencies who was going in to ask for help, and she said she might cut them slack if she thought they were serious about getting assistance. And that just adds to the discretion that the officers have. If the Court has no questions, I'm done. Thank you. Thank you. The matter is submitted. We'll go on to the... We're going to take a short break. All rise for a moment of recess. Now, if you want to give us a moment of recess. How long was that recess? We're going to take All rise. We're going to take a moment of recess.
judges: Pregerson, Berzon, Christen